In the Matter of the Application of BROOKLYN BAR ASSOCIATION in Respect of DAVID ZIRINSKY, an Attorney and Counselor at Law, Respondent.

Second Department, February 8, 1932.

*Edward H. Wilson* [*James Amadei* with him on the brief]], for the motion.

*Charles H. Kelby* [*Peter P. Smith* with him on the brief], opposed.

PER CURIAM. The official referee, after a hearing, has made a report containing findings and the recommendation that the respondent be disbarred.

In the main, the charges are that since June, 1914, after having been reprimanded by this court for his practice in submitting and taxing an illegal and excessive bill of costs (See *Matter of Zirinsky*, 163 App. Div. 960), the respondent has continuously been engaged in similar practices under a different form, by purchasing tax liens, bringing purported foreclosure actions thereon and utilizing a fictitious and excessive bill of costs for purposes of oppression against defaulting owners, and collecting or attempting to collect sums from such owners and others in settlements or in suits.

To be more specific in giving the acts and methods of procedure adopted by the respondent, we may say that it clearly appears without dispute that he has been continuously engaged in buying and collecting upon tax liens; and these were usually, if not always, purchased in the names of dummies who were persons employed in his office. He would then notify the owner of the fee of the property that a " client " held a tax lien. Sometimes this was done by writing letters, and often by sending by mail a printed form of a summons and complaint purporting to be an action for the foreclosure of the lien. On this summons and complaint the only typewriting would be the name of the defendant and the date of verification. Even the name of the respondent subscribed as attorney

was in printing, as was that of the person taking the verification. On some occasions the nominal owner of the fee, joined as a defendant, had been dead for many years, but his name was inserted as a defendant, showing no investigation by respondent. If the letters and pleadings thus mailed did not produce response, then followed personal service of the summons and complaint upon some of the parties. Then, if no offer to settle followed, notices of application for judgment (addressed to no one) would be served. As a matter of fact, no *lis pendens* was ever filed in these actions and, so far as can be discovered, no application was ever made to a court for judgment.

The next step would be the bringing of an action, in the name of one of the dummies as plaintiff, in the Municipal Court upon a summons and verified complaint alleging an agreement of the party or parties sued to settle and compromise at a certain amount, which would be ordinarily many times in excess of the tax lien and interest. Repeatedly it was testified that the party so sued had never made any agreement whatever to settle with either respondent or his dummy. As to the latter, persons sued testified that they had never seen him or had any talk with him. Nevertheless, the facts stated in the complaint in the Municipal Court actions were alleged upon the personal knowledge of the dummy plaintiff and so verified. If the person or persons sued employed an attorney and filed an answer, the actions were invariably discontinued or compromised at some sum approximating the amount of the lien and interest.

To illustrate, without selecting extreme cases:

The tax lien on the property of Edith Palmer was $24.15. After the usual procedure in which she declined to pay the excessive sum demanded, she was sued for $238.93 as a settlement agreed upon. She appeared by counsel and a compromise was effected and the action discontinued. Respondent paid to her $100 for a deed to him. The purchase price of her property some years before was $190.

There was a tax lien of $44 on the property of one Topping, which had originally cost $125. After the usual procedure had been followed, Topping was sued in the Municipal Court on an alleged compromise agreement of $418.38. Topping testified on the hearing that he had never made any agreement to settle. He did not appear, and judgment was taken against him for $448.94. Thereafter an attempt was made to apply a portion of his wages on the judgment debt by a garnishee execution. The attorney for his employer then represented him and the suit was withdrawn or the judgment was discharged.

Certain property stood in the name of one Gabriele Intrieri, who had long been dead. The amount of two tax liens was $27.02 each. Suit was brought in the Supreme Court to foreclose the lien, and the deceased owner was joined as a party together with "Mrs. Gabriele Intrieri, his wife, if any," and others, and notices of application for judgment were served. A son, having no interest in the property, attempted to negotiate a settlement on behalf of his mother, to whom the property had been devised. Later the mother and son were sued in the Municipal Court for an alleged agreed settlement of $430.04. Judgment for $521.07 was entered against these defendants. Eventually, when Intrieri employed a lawyer, the judgment was settled for the amount of the liens and interest.

The foregoing are taken at random from the thirty-three different cases concerning which proof was made on the hearing. They all vary but slightly in their main facts. We have no way of discovering the number of cases in which respondent was successful in exacting from poor and distressed people, unfamiliar with their rights and unable to employ a lawyer, the full amount of his claims. It may fairly be inferred from the extent of the respondent's business and his methods that these cases were numerous. In the cases examined there are all of the elements of deceit and oppression.

The basis of these excessive demands was, as we have indicated, the presentation of excessive and unconscionable bills of costs in these fictitious actions to foreclose tax liens never pressed to judgment. There were many items in these bills admittedly illegal and without foundation, which we will not enumerate. The large item was for a so-called "title search," usually fixed at a standard price of $200. As a matter of fact, under the procedure followed, no title search was necessary and none was obtained from any legitimate title company. The respondent had organized for his purposes a dummy company called "The Union Abstract and Searching Co., Inc.," and its alleged fees for "title search" were the ones contained in the "bills of costs." This "company" had no office, no bank account, no telephone, conducted no corporate business, kept no financial records, and made no income tax returns. As a matter of fact, it made no searches. What little investigation was made as to the title was made informally by clerks in the office of the respondent. Their investigations could not have gone far, for, as we have said, no note was taken of the death of owners, or the transfer of property by devise or inheritance in many cases. Yet, when a distressed owner of the property, poor and ignorant, sought to pay up and cancel the tax lien, he was

invariably presented with this padded bill of costs, including the fees for "title search," and this excessive amount was demanded.

It is unnecessary to go further into the facts. It is urged by the petitioner that the respondent, by buying these claims, transgressed the provisions of section 274 of the Penal Law, which forbids an attorney and counselor at law from buying certain obligations for the purpose of bringing actions thereon.

No doubt it might be readily found as a fact that such was the respondent's intent and primary purpose, and that his acts did not constitute an investment. The rule is strict in such cases. (*Moses v. McDivitt*, 88 N. Y. 62.) Likewise it is urged that, in the matter of directing the verification of the complaints by the dummy plaintiffs in Municipal Court actions on their own knowledge, the respondent violated section 1632 of the Penal Law, which provides that a person who willfully procures or induces another to commit perjury is guilty of subornation of perjury. It is evident that the respondent was responsible for the form of the complaint and at least might be held to have technically violated the statute, if not with willful intent. In neither case did the official referee make a direct finding of fact that the respondent had violated these statutes. We find it unnecessary to go so far as to find deliberate violation. There is enough in respondent's conduct that is highly reprehensible without here finding him guilty of a crime. However, the sections cited should have been a warning and a guide to him.

In the cases where the record owner of the property was dead or absent for some reason, there would usually be an attempt on the part of some relative or friend to make redemption in the interest of those occupying the premises or having some sort of title to the property. These intervenors were confronted by the same excessive bills of costs, and were usually made parties defendant when sued in Municipal Court as having agreed to a settlement. The respondent's justification of his conduct toward such a party not a title holder is that he was "a stranger to the title" and "had no right of redemption. Respondent could make any bargain with him he chose." In other words, the respondent was justified in wringing a settlement for any sum out of such kindly disposed but uninformed person on the basis of a fraudulent, fictitious and excessive bill of costs. We need make no further comment on it. It well illustrates the standard of integrity and professional ideals possessed by the respondent throughout his entire period of practice.

He has no place in the profession. He is incapable of understanding the standards, ethics and ideals impressed upon him when

he was admitted to the bar and which he should have learned both before seeking admission and in contact since with the honest and upright members of his profession. As we have said in a recent case (*Matter of Feinstein*, 233 App. Div. 541), the question of whether an attorney actually violates the provisions of a statute or whether there is an express statute covering his particular delinquency is unimportant. We measure his right both to enter and to remain in the profession by certain standards of which this respondent has not any comprehension whatsoever. He has been guilty of fraud, deception, unconscionable and oppressive acts and misconduct of such a nature that nothing remains for us to do but to confirm the report of the official referee and to direct that the respondent be disbarred.

Present — LAZANSKY, P. J., YOUNG, HAGARTY and TOMPKINS, JJ.; KAPPER, J., not voting.

Report of official referee confirmed, respondent disbarred, and his name ordered stricken from the roll of attorneys.